Complainants, three in number, each being the owner of a lot with dwellings thereon erected on a land development known as Haddon Homesteads, seek what now amounts to a *Page 317 
mandatory injunction against the defendants to compel them to remove the two dwellings and two garages erected by defendants on two lots of said Haddon Homesteads tracts, or, in the alternative, to expend additional moneys thereon so that the cost of the two dwellings and garages shall be $5,000 for each dwelling and $350 for each garage.
Complainants base their right to relief on an allegation that lots of defendants are encumbered with and subject to restrictive covenants as to the minimum cost of dwellings and garages to be erected on any of the lots of the Haddon Homesteads tracts and, further, that a former owner of the property so developed it and made conveyances of the lots that a neighborhood scheme resulted. If this is found to be the fact, the question as to whether complainants or any one or more of them would be entitled to relief under other applicable legal theories, such as the doctrine of equitable easements, need not be considered.
First, the restrictive covenant attempted to be enforced:
"The house to cost not less than five thousand dollars ($5,000.00) and the garage to cost not less than three hundred and fifty dollars ($350.00)."
The first point urged by the defendants is that there is no neighborhood scheme.
In Scull v. Eilenberg, 94 N.J. Eq. 759 (at p. 771);121 Atl. Rep. 788, the method of creating such a scheme is pointed out:
"The most complete way, of course, is by a reciprocal covenant, whereby the grantor covenants to insert, in apt language, like covenants in all deeds of his remaining lots or lands for the common benefit of all of his grantees and their assigns. Another way is for him to offer his lots for sale, and to sell them, on the representation that all lots will be conveyed subject tolike covenants for the common benefit, in which casepurchasers with notice or knowledge will be bound by thecovenant. But, in the absence of either of these methods (as was the case here), the courts will only spell out such a scheme from a plan of lots and sales therefrom where all the deeds from the common grantor for the lots making up any *Page 318 
particular neighborhood group of common benefit therefrom, are made subject to the common covenant. If, under these circumstances, the covenant is omitted from a deed of one lot so located that a violation on that lot of the provisions of the covenant would deprive the other lots of the benefit to be derived by them from the common observance of the restriction, there is, in the absence of knowledge or notice of the scheme on the part of the grantee in the deed for such omitted lot, a failure to make out a neighborhood scheme, at least as to that lot and as to such other lots as would lose the benefit of the scheme if it were violated on the lot not subjected to the covenant."
In the same case, Mr. Justice Katzenbach (at p. 762), pointed out the characteristics necessary to make the "scheme of restrictions" effective.
"A neighborhood scheme of restrictions to be effective and enforceable must have certain characteristics. It must be universal, that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly
situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit. `The burden follows the benefit,' as was said by Judge White in the case of Sanford v. Keer, 80 N.J. Eq. 240.
When there is no benefit there should be no burden. If the benefit be destroyed the burden should end. The requisite universality of the neighborhood plan was referred to by the late Vice-Chancellor Green in the case of DeGray v. Monmouth BeachClub House Co., 50 N.J. Eq. 329, in the following language: `The law, deducible from these principles and the authorities, applicable to this case, is that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development *Page 319 
and improvement of the property, by which it is divided into streets, avenue and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser, and it appears, by writings or by thecircumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof, and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan; one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme, and the covenant has been part of the subject-matter of his purchase.'"
First, then, how did the originator of this land development attempt to "create the scheme?"
Fidelity Corporation of New Jersey, hereinafter called Fidelity, having acquired title to certain lands situate partly in the borough of Haddon and partly in the township of Haddon, in June of 1922, caused it to be laid out in lots and sections, bisected and intersected by certain named streets, caused a map to be made thereof and had it approved by the proper authorities and filed it in the proper offices, and thereafter, in December of 1922, did likewise with respect to an additional adjoining tract of land situate wholly in Haddon township. Both of these developments were known as "Haddon Homesteads" and so advertised. The first map was designated as Plan No. 1 and the second as Plan No. 2. There were ninety-nine building lots on Plan No. 1, numbered from one to ninety-nine, inclusive, and on Plan No. 2 there were eighty-six lots numbered from 100 to 185, inclusive. Of the ninety-nine lots on Plan No. 1, five had been sold before Fidelity took title. In the deeds to Fidelity no restrictive covenants were imposed as to the lots on either plan.
Having laid out and mapped Plan No. 1, Fidelity proceeded with the sale thereof to various purchasers and conveyed all but three lots and a portion of another lot, all of the deeds containing restrictive covenants providing, in general, that only one dwelling and private garage should be erected *Page 320 
thereon, to be used for residential purposes only, the general size of the house to be erected, the cost thereof, the setback from the front and side lines of the lots, c.
On Plan No. 2 there were seventy-four lots sold by Fidelity, all of the deeds for which contained similar restrictive covenants. Three lots and part of another lot on Plan No. 1 and eleven lots on Plan No. 2, not having been sold by Fidelity, were purchased by the complainant Kind at an execution sale, resulting from a judgment obtained by Kind against Fidelity. This sale was in January of 1932 and divested Fidelity of title to all remaining lots on both plans.
Fidelity did not attempt to create a neighborhood scheme by reciprocal covenant, agreeing to insert like covenants in all deeds for the common benefit of all its grantees, as pointed out by Judge White in the Scull v. Eilenberg Case, supra, as being "the most complete way of so doing," but the testimony is that in offering lots for sale all purchasers were advised of the covenants and were told that like covenants for the common benefit of all purchasers would be inserted in all deeds to subsequent purchasers, which is the second method of creating a neighborhood scheme, as pointed out by that jurist, and in addition to this, as said in the same case, the court would "spell out such a scheme" from the "plan of lots" aforesaid "and sales therefrom" in view of the fact that "all the deeds from the common grantor," Fidelity, were made subject to the "common covenant." But it is argued that under the circumstances herein the court would not be justified in "spelling out a scheme" because the two lots and a part of one lot on Plan No. 1 and the eleven lots on Plan No. 2, purchased by Mrs. Kind at execution sale aforesaid, had not been restricted by Fidelity at the time of the sale, so that she acquired title freed therefrom, with the result that common covenants were not inserted in all deeds from the common grantor, and because two other lots on Plan No. 1 were sold by Fidelity without the covenants in the deeds.
As to the thirteen and one-half lots purchased by Mrs. Kind at the time of the sale aforesaid, Mrs. Kind was the owner of lot 111 on Plan No. 2. Her deed for that lot contained the Fidelity covenants. According to the testimony, *Page 321 
Fidelity had sold the lots conveyed by it to the various grantees within about two years of the opening of the development, so that at the time of the sale under execution the general observance of the restrictive covenants by the lot owners was evidenced by a mere casual inspection of the neighborhood, and there may be no doubt that Mrs. Kind bought with knowledge of the general scheme, not only through her observation of the character of the buildings already erected, but from the covenants in her deed. She bought such title as Fidelity had at the time of the sale, and that title was encumbered by the Fidelity covenants, which it had represented to purchasers of lots as being applicable to the whole tract.
As to the lots sold by Fidelity, in the deeds for which the restrictive covenants were not inserted, it appears that one lot was sold at auction when Fidelity was endeavoring to close out its lot holdings, and prior to the sale, Fidelity had erected thereon a conforming building, and there may be no doubt, as I view the evidence, that the purchaser thereof took with notice of the neighborhood scheme. As to the other lot on Plan No. 1, the evidence does not disclose the nature of the transaction, but we may not presume that it was disposed of other than in the ordinary course of the other sales of like lots on the tracts, and the purchaser thereof is presumed to have made reasonable inquiry. But aside from this, the omission of covenants in the deed is not fatal. Shoyer v. Mermelstein, 93 N.J. Eq. 57;114 Atl. Rep. 788.
Going back to the purchase by Mrs. Kind at execution sale, we find that she, in turn, conveyed the thirteen and one-half lots to Haddon township and in her deed imposed like restrictive covenants, and that when Haddon township conveyed to defendants, its agreement was as follows:
"A deed of conveyance properly executed by the Chairman of the Township Committee and attested by the Township Clerk shall be delivered to the purchaser clear of all encumbrances except the restrictions running with the land and any existing easements."
The result is that defendants took subject to the Kind restrictions and with full knowledge of the Fidelity restrictions, *Page 322 
as well as of the neighborhood scheme, of which, the evidence discloses, defendants' knowledge dated from the very inception of the development, one of the Hanlys having actually sold some of the lots from Plan No. 1, at least. This finding is fortified by the evidence that Milask, defendants' supervisor of construction, told Mr. Tyler that defendants were circumventing the restrictions by adding the cost of the lot to that of the building.
Defendants urge, however, that the only testimony that Fidelity sold the lots under a representation that they would be restricted as to all grantees was that of one Troth, who so testified, and the defendants urge that parole evidence is not admissible to prove "the adoption of the neighborhood scheme." If complainant had endeavored to prove by parole evidence a neighborhood scheme, we would agree with defendants' contention, but that was not the purpose or purport of the testimony offered by the complainant. The purpose was to prove representations made by Fidelity at the time of the sales of lots and not the covenants afterwards inserted in the deeds. The covenants were proved by the deeds themselves and the testimony as to representation that all deeds would contain them must, under the circumstances of this case, be proved by the oral testimony, inasmuch as Fidelity did not covenant in the deeds that like covenants would be inserted in all conveyances. It is by making parole representations that the second method of creating a neighborhood scheme, as pointed out by Judge White, is effectuated, and in the Scull v. Eilenberg Case, supra, the court said:
"There is no covenant by the common grantor to insert the common covenant in all the deeds, nor is there any proof in the record of any other verbal or written promise or representation so to do."
In Sanford v. Keer, 80 N.J. Eq. 240; 83 Atl. Rep. 225: "and such purchasers are induced to buy the lots by and in reliance upon representations, either public or private."
My conclusion is that Fidelity attempted to and did develop and sell the lots in question under a neighborhood scheme, of which the defendants were fully aware at the time they purchased the property now owned by them, which property *Page 323 
is bound thereby, and in addition to my reasons, as heretofore advanced for that conclusion, it seems to me that an "examination" of what was actually done by Fidelity "spells out a neighborhood scheme in its various gradations as applied to different sections" of the two tracts.
It must not be overlooked that after all, it is a question of fact. As said in Humphreys v. Ibach, 110 N.J. Eq. 647 (at p.652); 160 Atl. Rep. 531:
"Whether the estate intended to and did create a general neighborhood plan, is a question of fact to be answered not only by the wording of the deeds but by the surrounding circumstances and the acts of the parties."
But it is argued that even if we conclude that Fidelity did attempt to create a neighborhood scheme, the scheme must fall because of lack of uniformity of the restrictive covenants.
An examination of the admissions before trial demonstrate that there was not an absolute uniformity of restrictions imposed on all lots on both plans, but it is established that "restrictions on every lot throughout a development need not be identical."Humphreys v. Ibach, supra, citing Sanford v. Keer, supra, and Schreiber v. Drosness, 100 N.J. Eq. 591;135 Atl. Rep. 920. If, however, the lack of uniformity in the restrictions as imposed results in wholly or partially destroying the scheme so "as clearly to neutralize the benefits of the restrictions to the point of defeating the object and purpose of the covenant" the burden thereof is and should be removed. After all, the question is whether the variations in the restrictive covenants are such as to destroy the essential benefits enjoyed by the lot owners from the general scheme, as well as the benefits to the remaining lots of the tract. The mere fact of variations in the covenants means nothing unless it would be inequitable by reason thereof to enforce the uniform restrictions. Humphreys v. Ibach, supra, wherein it is said:
"The plan and protection it gives to those who have made their homes on the tract in reliance thereof, fails only so far as the enforcement thereof is inequitable. Beyond that, it remains valid and enforceable."
Generally speaking, the restrictions are uniform as to both *Page 324 
tracts, in that (1) dwelling and private garage on one lot, to be used for private residence only; (2) the house to be not less than two stories high and containing not less than three bedrooms on the second floor; (3) cost of construction; (4) setback from front and side lines of lots. We are dealing at this point with restrictions as to cost and we find that in every conveyance from Fidelity, excepting two heretofore mentioned, such covenant has been inserted, and that there is absolute uniformity as to cost on Plan No. 2, and that none is restricted on either plan at less than $5,000 for the dwelling and $350 for the garage, but we do find that on Plan No. 1 the restrictions as to cost on lot 86 are $6,500 and $500, lots 79 to 85, inclusive, and from 87 to 89, inclusive, $5,000 and $350, lots 18, 20, 23, 27 and 28, $6,500 and $500, lots 21 to 26, inclusive, $5,500 and $400, lot 19, $5,000 and $350.
It would seem that this variation in the scheme of cost on Plan No. 1 would not suffice to defeat the scheme as to Plan No. 2, and even if Plan No. 1 was defective in that respect (I do not so hold), still defendants should be restrained as to complainants Kind and McComb. It would seem to me that the scheme was benefited by the higher cost restriction on some of the lots on Plan No. 1 and that the variance in that restriction on Plan No. 1 does not neutralize the benefits of the restrictions to the point of defeating the object and purpose of the covenant.
The essential purpose of the cost covenant was to secure a type of dwelling in conformity with the neighborhood scheme, so that none should cost less than $5,000, and the general scheme was better secured by the erection of more pretentious houses on those lots where the purchasers were willing so to do. Even were this not so, we must not overlook the fact that as to the lots on Plan No. 2 there is a complete uniformity as to the cost of buildings on all lots and, while the owners of lots on Plan No. 1 might be denied relief, still Kind and McComb would be entitled thereto.
Defendants point out variations in the remaining restrictive covenants other than the cost covenant, to be, generally, in the distance of the front and side lines for the location of the buildings, the fact that some were restricted against *Page 325 
nuisances and some not, and in the case of three lots, stores were permitted to be erected, and in addition to this, restrictive covenants on Plan No. 2 were preambled by the following clause: "Subject to the following restrictions and conditions applying to the property hereby conveyed only," and that the preamble as to the other lots was: "Restrictions imposed on this lot and to other lots on the party of the first part,"c.
There is no evidence before me to justify a finding that it was not entirely proper to provide that lots 158, 159 and 123 on Plan No. 2 could be used for store purposes, even though it does appear that lot 124 was denied that privilege. Certainly in the development of the scheme the developers had a right to provide store facilities for the benefit of owners of lots within the restricted territory, and the defendants herein took title subject to the covenants and with full knowledge of the existence of the stores.
The complainants are entitled to injunctive relief if, under the evidence, the cost of each house to the Hanly Brothers was less than $5,000 and each garage less than $350, and I find from the evidence that the cost of house and garage No. 8 was $4,618.26 and the cost of house and garage No. 7 was $4,584.59, as disclosed by Miss Parker's testimony and the books of Hanly Brothers, and as set forth on page 9 of the brief of the complainants, as to which counsel for the defendants say — "The analysis set forth on page 9 of complainants' brief is correct." But I also find that to this must be added the five per cent. commission of Milask of $230.07, my understanding being that this commission was intended to include the $100 charge for plans and specifications, and to this should be added the cost of French doors at $15. To the total figures above found as the actual cost, the defendants say that the owner is entitled to ten per cent. as a profit, and they also say that the cost figure is on the basis of building twenty-five houses and that a saving of $660 has been effected in discounts by reason of mass buying. I have no doubt but what the Hanly Brothers have greatly reduced the cost of these buildings by contracting on the basis of a larger number of houses, but it seems to me that when the restrictions *Page 326 
said that the house was to cost not less than $5,000 and the garage not less than $350, it matters not what the saving was or how it was accomplished, nor by whom. The restriction is violated if the cost to the owner of the property, no matter who it may have been, was less than the figures stated in the restriction.
Since this case was submitted, my attention has been called toCevasco v. Westwood Homes, Inc., 15 Atl. Rep. 2d 140, decided by Vice-Chancellor Lewis, who held:
"A covenant restricting the erection of buildings costing less than a certain sum will not be enforced by injunction, where status of neighborhood has become such that erection of buildings costing said minimum sum is not feasible and the covenant is no longer beneficent."
With this proposition of law we are in complete accord, but there is no evidence herein that the status of the neighborhood has become such that erection of buildings costing a minimum sum is not feasible, or that the cost covenant has become non-beneficent. It is true that in the intervening years since 1922 the cost price of construction has varied, and it is undoubtedly true that in the years to come it will continue to fluctuate, but the evidence does not justify a finding that by reason thereof it would be inequitable at this time to enforce the covenant. In fact, the evidence of defendant Hanly is that "in 1923, 1924 and 1925 a much cheaper house than what you could build to-day for the same amount of money" could be built. There was an attempt to show that certain houses erected on Plan No. 2 cost less to build than $5,000, but complainants' evidence shows to the contrary.
The decree in this case should be that the defendants expend a further sum of money on each building so as to make the total cost thereof in conformity with the restrictive covenant, and that said expenditure be made within a certain time from the date of this decree, and that on failure thereof, the defendants be compelled by mandatory injunction to remove or demolish the present structures. *Page 327